UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAFAEL REYES,<br><br>    Petitioner,<br><br>    v.<br><br>J. SOTO, Warden,<br><br>    Respondent. | Case No. CV 15-8566-CJC (SP)<br><br>FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |

This Final Report and Recommendation is submitted to the Honorable Cormac J. Carney, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California. The court makes this Final Report to correct two word errors in the original Report.

## I.

## **INTRODUCTION**

On December 10, 2015, petitioner filed a First Amended Petition for Writ of Habeas Corpus by a Person in State Custody ("First Amended Petition" or "FAP"). Petitioner challenges his 2012 conviction in Los Angeles County Superior Court

for second degree murder with firearm enhancements, for which he was sentenced to forty years to life in prison.

The FAP raised five grounds for relief, but the court previously dismissed four of the grounds. Ground One remains, alleging there was insufficient evidence to convict petitioner of second degree murder.

For the reasons discussed below, petitioner's claim does not merit habeas relief. It is therefore recommended that the FAP be denied.

## II.

## **STATEMENT OF FACTS**[1]

About 1:00 a.m. on August 26, 2011, Nicholas Jaramillo, petitioner, and Walter Velasco drove to a house at the corner of 87th Place and Wall to obtain marijuana.[2] Jaramillo testified that he had been to that location to obtain marijuana twice before with Velasco and once with petitioner. Velasco drove, petitioner was seated in the front passenger seat, and Jaramillo sat in the back seat behind petitioner.

Los Angeles Police Department Detective Joseph Kirby testified that the house at the corner of 87th Place and Wall was a place where crack cocaine was sold. The house used a "hook" in its transactions – i.e., a person who loitered around the premises and made contact with persons in the area whom the hook

---

[1] The facts set forth are drawn substantially verbatim from the California Supreme Court's decision on direct appeal. *See* LD 6 at 2-6. Such statement of facts is presumed correct. 28 U.S.C. § 2254(e)(1); *Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009). Because petitioner challenges the sufficiency of the evidence, this court has conducted an independent review of the record. *See Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

[2] Jaramillo testified under a grant of immunity that concerned his attempt to purchase narcotics and did not concern his participation in a murder or shooting. He admitted a 2008 conviction for assault with a deadly weapon and a 2012 conviction for auto theft.

2

believed were present to purchase crack cocaine. The hook would advise a potential buyer of the next steps in the transaction process.

As they arrived at the house, Jaramillo saw two Black men standing outside. Jaramillo believed that the men were looking for people who wanted to buy narcotics. According to Jaramillo, Velasco parked across the street from the house. Petitioner got out of the car and crossed the street to see if there were any drugs. After a while, Jaramillo heard two gunshots and saw one of the two Black men who had been standing in front of the house run about 20 feet before falling to the sidewalk.

After the gunshots, petitioner got back in the car. Realizing that one of the Black men he had seen had been shot, Jaramillo felt shock and disbelief. He looked at Velasco whose face appeared to convey shock and disbelief. Velasco began to drive toward the freeway, but Jaramillo convinced him to return because he believed that it was not right that a man had been shot and they did not check on him. Velasco parked at the corner, down the street from "where it happened." Petitioner and Velasco got out of the car, and Jaramillo moved to the driver's seat. The police arrived shortly thereafter and before he could "do anything."

About 1:00 a.m. on August 26, 2011, Officer Sean Dempsey and other officers responded to a shooting call at 87th Street and Wall Street. Nearby, at 87th Place and Wall Street, the officers found Richard Lewis lying on the sidewalk. Lewis had sustained two gunshot wounds and was unconscious and not breathing. Officer Dempsey called for an ambulance. Lewis died from a gunshot wound that perforated his lungs, trachea, and aorta. Two bullets were recovered from Lewis's body during the autopsy.

At the scene, Officer James Grace contacted a person who pointed west and said, "They went that way." The person gave a brief description of a vehicle. Officer Grace drove west and observed a vehicle – a silver or light gold four-door

Nissan Altima – that matched the witness's vehicle description. The Altima was parked on the north side of the street and was facing west. A person was sitting in the driver's seat. Petitioner's fingerprints were found on an open beer bottle in the Altima.

Officer Kurt Lockwood and his partner were near the scene of the shooting call. Officer Lockwood saw two Hispanic males – petitioner and Velasco – running into a restaurant parking lot from the direction of the shooting call. Officer Lockwood and his partner conducted a pedestrian stop. Officer Lockwood visually inspected the men for weapons and determined that they were not armed. Officer Lockwood had not received a description of the persons suspected of being involved in the shooting and allowed petitioner and Velasco to leave. Subsequently, Officer Ramon Barunda and his partner detained petitioner and Velasco.

Officer Noel Sanchez found a .22 caliber Jennings handgun on the sidewalk on Main Street just south of Manchester. The police found two spent .22 caliber cartridge casings on the ground in the area of 87th Place. A criminalist determined that the two cartridge casings found at the scene and one of the bullets recovered from Lewis's body by the coroner had been fired from the .22 caliber Jennings handgun.

Detective Kirby did not direct anyone to take gunshot primer samples from petitioner, Velasco, or Jaramillo. In Detective Kirby's experience, tests for gunshot residue were not very reliable.

Later that morning, Detective Kirby and another detective interviewed Jaramillo. Because he was afraid, and did not want to put Velasco at the scene, or "snitch" on petitioner, Jaramillo initially denied any knowledge of what had happened. Jaramillo testified that he did not see petitioner shoot the Black man. He testified at the preliminary hearing that he told Detective Kirby that petitioner

began shooting the victim with a handgun from a distance of approximately four to five feet and that Velasco was in the car at the time of the shooting. According to Jaramillo, his preliminary hearing testimony was truthful. Jaramillo testified that he "told the detective, per [his] testimony, that [petitioner] . . . shot and killed that African American man." He denied that he had blamed petitioner to protect Velasco from responsibility for the shooting.

On cross-examination, Jaramillo acknowledged that he testified at the preliminary hearing that he did not see petitioner shoot anybody. When asked to explain the inconsistency in his preliminary hearing testimony, Jaramillo stated, "I never seen him shoot anybody." Further on cross-examination, Jaramillo admitted that he went to the house at 87th Place and Wall to purchase rock cocaine and not to purchase marijuana as he had earlier told the police several times and as he had testified at the preliminary hearing and at trial. Jaramillo also admitted that, as he told Detective Kirby, he had been to the drug house 10 times and not two times as he testified. He also admitted that he had gone with Velasco to the drug house 10 times, but he had never gone with petitioner.

Jaramillo testified that initially he gave the police a version of the events in which he was on 87th Street near Main, he did not hear any shots, he did not know that a murder had been committed, and he had been sitting in the driver's seat of the car drinking a beer. The police told him that if he stuck to that story he would be booked for murder. Asked if he believed that if he changed his story he would be released, Jaramillo responded, "Well, I thought about it, and my best chances were to say the truth." Jaramillo was never booked for murder and was released shortly after he changed his story. Jaramillo affirmed on cross-examination that it was his testimony that petitioner was the shooter.

5

Detective Joseph Kirby testified about his interview with Velasco.[3] Velasco told the detective that he drove to the area of 87th Street between Main and Wall to buy rock cocaine. He and petitioner got out of the car and approached a house to buy rock cocaine.

Detective Kirby also testified about a video that was played for the jury that showed petitioner in custody in the holding tank at the Southeast Station at 3:00 a.m. on August 26, 2011. The holding tank had a window and a door. On the outside of the window was the watch commander, the person in charge of all of the activities at the Southeast Station. The holding tank did not have a toilet or urinal. If a person needed to use the bathroom, he had to notify the watch commander verbally, or by knocking on the holding tank's window. The video showed petitioner look out the holding tank's window then approach and urinate on his leather jacket which was in the corner of the holding tank. Petitioner then turned over his jacket and urinated on the other side. Although the video did not show a stream of urine, Detective Kirby testified that he determined that petitioner was urinating on his jacket by the way petitioner stood, petitioner's motions, and visible pooling urine. Detective Kirby testified that there was a "popular perception" that urine removes gunshot residue from hands or clothes.

The police took DNA swabs from petitioner, Velasco, and Jaramillo. Those swabs were compared to a DNA swab taken from the .22 caliber Jennings handgun. A criminalist determined that the swab from the handgun contained a mixture of DNA from more than three people. Because there was a mixture of DNA, the criminalist could not conclude that the DNA came from any particular person. The criminalist could, however, determine the probability that a person's DNA was included within the mixture. According to the criminalist, the

---

[3] Velasco asserted his 5th Amendment right to remain silent, and the trial court deemed him unavailable to testify.

6

"combined probability of inclusion" that petitioner's DNA fit within the profile of the DNA mixture found on the handgun was one in 8,200. The criminalist explained that under that combined probability of inclusion, if 8,200 people were selected at random, it was probable that one person's DNA would fit the within the DNA mixture found on the handgun. With respect to Velasco's DNA, the combined probability of inclusion that his DNA was part of the mixture was one in 1,400. The combined probabilities of inclusion for petitioner and Velasco differed because the criminalist looked at 15 locations for petitioner and only 14 for Velasco. The information was insufficient to include or exclude Jaramillo's DNA.

### III.
### **PROCEEDINGS**

On June 8, 2012, following a jury trial, petitioner was convicted of second degree murder (Cal. Penal Code § 187(a)) with firearm enhancements (Cal. Penal Code §§ 12022.53(b)-(d)). LD 1 (Clerk's Transcript ("CT")) at 489. On January 30, 2013, the trial court sentenced petitioner to forty to years to life in prison. *Id*.

Petitioner, represented by counsel, appealed his convictions. LD 3. Petitioner raised three grounds on appeal: (1) insufficient evidence to convict; (2) a sentencing error; and (3) a clerical error. *Id*. The California Court of Appeal modified the sentence and record, but otherwise affirmed the judgment. LD 6.

Petitioner then filed a petition for review in the California Supreme Court, presenting the same sufficiency of the evidence claim raised below. LD 7. The California Supreme Court summarily denied the petition for review on July 23, 2014. LD 8.

Petitioner initiated this federal action by filing a Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition") and a Motion for Stay and Abeyance on November 3, 2015. On November 5, 2015, due to petitioner's failure to properly execute the Petition, the court dismissed the Petition with leave to

amend.

On December 10, 2015, petitioner filed a properly executed First Amended Petition and Motion for Stay and Abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269, 276-79, 125 S. Ct. 1528, 161 L. Ed. 440 (2005) ("Motion for Stay"). Petitioner asserted five grounds for relief in the FAP: (1) there was insufficient evidence to support his murder conviction; (2) the California Supreme Court announced a new rule in *People v. Banks*, 61 Cal. 4th 788, 189 Cal. Rptr. 3d 208 (2015), affecting petitioner's constitutional rights that should be retroactively applied under *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989); (3) ineffective assistance of appellate counsel for failure to challenge his trial counsel's failure to challenge the sufficiency of the evidence under Section 1111 of the California Penal Code; (4) ineffective assistance of appellate counsel for failing on direct appeal to challenge trial counsel's failure to call a key witness; and (5) the reasonable doubt instruction, CALCRIM No. 220, as presented to the jury, was unconstitutionally vague and ambiguous. Respondent filed an Opposition to the Motion for Stay, arguing the Motion for Stay should be denied because the FAP was untimely and petitioner failed to demonstrate good cause for his failure to exhaust grounds two through five.

On September 13, 2016, the court concluded the First Amended Petition was timely, but grounds two through five were unexhausted without good cause, and ground two was plainly meritless. The court denied the Motion for Stay, dismissed ground two with prejudice, and dismissed grounds three through five without prejudice.

Respondent filed an Answer to the FAP on October 12, 2016, and petitioner filed a Reply to the Answer on January 6, 2017.

# IV.
# STANDARD OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA provides that federal habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings *unless* the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2) (emphasis added).

In assessing whether a state court "unreasonably applied" Supreme Court law or "unreasonably determined" the facts, the federal court looks to the last reasoned state court decision as the basis for the state court's justification. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991); *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). Here, the California Court of Appeal's decision on May 8, 2014 stands as the last reasoned decision on Ground One.

# V.
# DISCUSSION

**A.  Petitioner Is Not Entitled to Relief on His Insufficient Evidence Claim**

Petitioner argues there was insufficient evidence that he was the shooter so as to support his murder conviction. FAP at 5, Ex. 1. Specifically, petitioner contends his conviction rested almost entirely on the testimony of Jaramillo, but the testimony was unreliable. *Id*.

"[T]he Due Process Clause protects the accused against conviction except

9

upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). The role of a federal court on habeas review is to determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "The reviewing court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" *Id.* (citation omitted).

Generally, in applying the *Jackson* standard, the court looks to the elements of the crime charged under state law to determine what evidence is needed to support a conviction and then turns to the federal question as to whether the state court was objectively unreasonable in its application of *Jackson*. *Jackson*, 443 U.S. at 324 n.16; *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011); *Juan H. v. Allen*, 408 F.3d 1262, 1278 n.14 (9th Cir. 2005). But here, petitioner's claim does not hinge on whether there was sufficient evidence to support each element of the crime. Instead, petitioner argues that there was insufficient evidence showing he was the perpetrator.

At trial, Jaramillo, under a grant of immunity, testified that he, Velasco, and petitioner drove to a house in South Central Los Angeles to purchase marijuana. LD 2 (Reporter's Transcript ("RT")) at 391-92, 396-98. Jaramillo testified that they parked across the street from the house, there were two African American men in front of the house, and petitioner got out of the car and walked across the

street. *Id*. at 400-01. Jaramillo heard two gunshots and saw one man fall and the other one run away. *Id*. at 402-03. Jaramillo then testified that petitioner got back in the car and Velasco drove off. *Id*. at 404-05. Jaramillo convinced Velasco to turn the car around and go back because he did not think it was right to not check on the man who had been shot. *Id*. at 405-07. Once they arrived back at the house, petitioner and Velasco got out while Jaramillo got into the driver's seat. *Id*. at 406-07. The police then arrived and detained Jaramillo. *Id*. at 407-08.

During the examinations, Jaramillo acknowledged inconsistencies with prior statements. Jaramillo admitted that when detained, he initially told Detective Kirby that he was unaware of any shooting and then told him petitioner shot the victim. *See id*. at 414, 439-40. Then at the preliminary hearing, Jaramillo testified that he did not see petitioner shoot the victim. *Id*. at 425-26; *see* CT at 80-82. Jaramillo also admitted that he actually went to the house the day in question to purchase rock cocaine rather than marijuana. RT at 427-28.

Jaramillo also stated that he was scared to testify at the trial and preliminary hearing. *Id*. at 473-74; *see also id*. at 531-32. Jaramillo had received threatening messages warning him not to testify. *Id*. But Jaramillo testified at the preliminary hearing that he was not scared to testify. *Id*. at 482.

The Court of Appeal reasonably determined Jaramillo's testimony was substantial evidence sufficient for a rational jury to conclude that petitioner committed the murder. *See* LD 6 at 8. Although petitioner points to significant inconsistencies in Jaramillo's testimony, at bottom petitioner is asking the court to reinterpret the evidence. But it is the province of the jury to weigh the evidence, assess witness credibility, and resolve evidentiary conflicts. *See Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-total deference under *Jackson*.") (citing *Schlup v. Delo*, 513 U.S. 298, 330, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)); *Walters,* 45 F.3d at 1358.

1 | Here, the jury was presented with Jaramillo's testimony, including all its
2 | inconsistencies, and evidently determined his testimony was truthful.
3 |     Moreover, the Court of Appeal reasonably determined there was sufficient
4 | evidence independent of Jaramillo's testimony to support petitioner's conviction.
5 | *See* LD 6 at 8. A witness had provided the police with a description of the vehicle
6 | near the shooting. RT at 191-92. Police officers then spotted a vehicle matching
7 | the description parked near the scene of the shooting, saw a door was open, and a
8 | person in the driver's seat. *Id*. at 191-93. Other police officers then spotted
9 | petitioner and Velasco running from near the area where the shooting took place.
10 | *See id*. at 205-06, 210-11. Petitioner's fingerprints were on a beer bottle found in
11 | the car. *See id*. at 242-43, 251. The gun used in the shooting was found near the
12 | location of the crime. *See id*. at 232, 272-73. Although the criminalist could not
13 | conclusively determine whose DNA was on the gun used in the shooting,
14 | petitioner's DNA fit within the profile of the DNA mixture found on the gun, as
15 | did Velasco's. *Id*. at 338-39; *see also id.* at 340, 345-46. The criminalist testified
16 | that the probability that petitioner's DNA was included was 1 in 8,200, and the
17 | probability that Velasco's DNA was included was 1 in 1,400. *Id.* at 338-39. So
18 | far, this additional evidence places petitioner at the scene and running from the
19 | shooting, and strongly indicates either petitioner or Velasco was the shooter.
20 |     But there was one item of additional evidence that tended to show it was
21 | petitioner, and not Velasco, who was the shooter, just as Jaramillo testified. This
22 | was a video recording showed petitioner, while in the holding tank, urinating on
23 | his leather jacket two hours after the shooting. *Id.* at 527-28. Detective Kirby
24 | testified there is a popular perception that urine removes gunshot residue from
25 | clothing. *Id*. at 305. Taken together, the direct and circumstantial evidence was
26 | sufficient for a rational juror to determine petitioner was the perpetrator.
27 |     Accordingly, the Court of Appeal's finding that there was sufficient
28 |

evidence for a rational fact finder to conclude that petitioner was the shooter was a reasonable determination of the facts. Petitioner is therefore not entitled to habeas relief.

**B.** <u>**Petitioner Is Not Entitled to an Evidentiary Hearing**</u>

In his Reply, petitioner requests an evidentiary hearing on his claim. Reply at 2. An evidentiary hearing is not warranted where "the record refutes the applicant's factual allegations or otherwise precludes habeas relief." *Schrirro v. Landrigan*, 550 U.S. 465, 474, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007). In this case there are not facts in dispute; the only dispute is whether the evidence was sufficient to convict petitioner. The record shows the Court of Appeal reasonably concluded the evidence was sufficient, and thus precludes habeas relief. As such, petitioner's request for an evidentiary hearing should be denied.

## VI.
## RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Final Report and Recommendation; and (2) directing that Judgment be entered denying the First Amended Petition and dismissing this action with prejudice.

DATED: March 20, 2019

SHERI PYM
United States Magistrate Judge